IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| ELIZABETH A. PERSIANI, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:06-CV-0126-CCH |
| MICHAEL J. ASTRUE, Commissioner | : | |
| of the Social Security Administration, | : | |
| | : | |
| Defendant. | : | |

## <u>O R D E R</u>

Plaintiff is a 40-year-old female seeking Social Security Disability Benefits ("DIB") under the Social Security Act ("the Act") and alleging disability and entitlement thereto on the basis of carpal tunnel syndrome, emphysema, hearing loss, nerve damage, and a herniated disc.  Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") which denied Plaintiff's claim.

Plaintiff filed an application for DIB on November 26, 2003, alleging an onset date of April 2, 2003.  Record (hereinafter "R.") at 13, 37, 54-57.  After that application was denied initially and on reconsideration, Plaintiff requested a hearing

before an Administrative Law Judge ("ALJ") and a video hearing[1] was held on August 2, 2006.  Following the hearing the ALJ issued a decision on August 17, 2006, denying Plaintiff's claim on the grounds that she was not under a "disability" as defined by the Act.  R. at 13-20.  On October 27, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's Request for Review of the decision of the ALJ, and made that decision the final decision of the Commissioner.  R. at 6-9. Plaintiff, having exhausted all administrative remedies, filed this action on December 13, 2006.  It is now before the undersigned upon the administrative record and the parties' pleadings and briefs and is ripe for review pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the undersigned **ORDERS** that the final decision of the Commissioner be **REVERSED** and **REMANDED** to the Commissioner.

## I.    STANDARD FOR DETERMINING DISABILITY

An individual is considered to be disabled for purposes of disability benefits if he or she is unable to "engage in any substantial gainful activity by reason of any

---

[1] According to the ALJ decision, the ALJ presided over the video hearing from Philadelphia, Pennsylvania, while the claimant and the Vocational Expert appeared at a teleconference center in Atlanta, Georgia.  R. at 13.

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the initial burden of establishing the existence of a "disability" by demonstrating that he or she is unable to perform his or her former type of work.  Once the claimant has met this burden, the burden shifts to the Commissioner to show that, considering claimant's age, education, work experience and impairment, there are some other types of jobs that exist in the national economy that the claimant can perform.  The ultimate burden, however, rests upon the claimant to prove that he or she is unable to engage in any substantial gainful activity that exists in the national economy.  Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

As summarized below, a five-step sequential analysis must be used when evaluating a disability claim.

(1)     The Commissioner must determine whether the applicant is currently working; if so, the claim is denied.

(2)     The Commissioner must determine whether the claimed impairment is severe; that is, whether the impairment or combination of impairments significantly limits the individual's physical or mental ability to do basic work activities; if not, the claim is denied.

(3)     The Commissioner must determine whether the impairment equals or exceeds in severity certain impairments described in the impairment listings in the regulations; if it does, the claimant is automatically entitled to disability benefits.

(4)     The Commissioner must determine whether the applicant has sufficient residual functional capacity to perform past work; if so, the claim is denied.

(5)     The Commissioner must determine, on the basis of claimant's age, education, work experience, and residual functional capacity, whether

the applicant can perform any other gainful and substantial work within
the economy; if so, the claim is denied.

See 20 C.F.R. §§ 404.1520 - 404.1576.

The Commissioner, adopting the findings of the ALJ, made the decision to deny
DIB benefits at Step 5, finding that, although the claimant is no longer able to perform
her past relevant work as a fabricator (assembler) or cashier, she is able to perform
certain sedentary jobs that are available in significant numbers in the nationwide
economy.

## II.    **FINDINGS OF THE ALJ**

The ALJ made the following findings of fact ("FOF"):

(1)    The claimant meets the insured status requirements of the Social
Security Act through December 31, 2008.

(2)    The claimant has not engaged in substantial gainful activity since
April 2, 2003, the alleged onset date (20 CFR 404.1520(b) and 404.1571
*et seq.*).

(3)    The claimant has the following severe impairments:  bilateral
carpal tunnel syndrome, emphysema, and a herniated disc at the level of
C6 in the cervical spine (20 CFR 404.1520(c)).

(4)    The claimant does not have an impairment or combination of
impairments that meets or medically equals one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 4040.1525 and 404.1526).

(5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the exertional demands of sedentary work, or work which is generally performed while sitting and does not require lifting in excess of ten pounds.  She is able to do the required amount of standing, walking, and sitting necessary for sedentary work.  As to manipulative limitations, she is unable to constantly use her right and left upper extremities because of her carpal tunnel syndrome.  Also, the claimant does require working in a clean atmosphere because of her emphysema [that is, avoidance of concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.].

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7)     The claimant was born on April 9, 1967.  The claimant was 35 years old on the alleged disability onset date and is currently 39 years old, which ages are both defined as a younger individual (20 CFR 404.1563).

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

(11)   The claimant has not been under a "disability," as defined in the Social Security Act, from April 2, 2003 through the date of this decision (20 CFR 404.1520(g)).

R. at 15-20.

## III.   CLAIMS OF ERROR

Plaintiff alleges that the decision of the Commissioner is in error for the reasons set forth below.

A.    The ALJ failed to evaluate properly Plaintiff's manipulative and exertional limitations.

B.    The ALJ failed to evaluate properly Plaintiff's headache pain.

C.    The ALJ failed to evaluate properly Plaintiff's hearing loss.

D.    The ALJ failed to evaluate all of Plaintiff's spirometry results and failed to require additional testing or clarification.

E.    The ALJ failed to identify a specific job that Plaintiff could perform, given her limitations.

## IV.   SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of social security benefits by the Commissioner is limited.  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  The only function

of the Court is to determine whether there is substantial evidence in the record to support the findings and decision of the Commissioner and whether proper legal standards were applied in the fact-finding process.  The findings of the Commissioner are conclusive if supported by substantial evidence and proper legal standards were applied.  Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Hillsman v. Bowen, 804 F.2d 1179, 1180 (11th Cir. 1986); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

Substantial evidence is more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  Richardson v. Perales, 402 U.S. 389, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971); Hillsman, 804 F.2d at 1180; Bloodsworth, 703 F.2d at 1239.  "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  In contrast, the Court's review of the ALJ's application of legal principles is plenary.  Walker, 826 F.2d at 999.

## V.    ANALYSIS OF CLAIMS OF ERROR

### A.    Manipulative and Exertional Limitations

Plaintiff first argues that the ALJ failed to evaluate properly her manipulative and exertional limitations.  The medical evidence in the record reflects that Dr. Scott Gillogly treated Plaintiff for carpal tunnel syndrome on September 18, 2003, and concluded that she could perform sedentary work, but should avoid "any strenuous physical or repetitive activity with either hand."  R. at 200.  In addition, in 2004, Dr. Scott Seiler, a hand surgeon, stated that Plaintiff was unable to perform repetitive activity, "to include lift, push, pull."  R. at 260.  According to Plaintiff, although the ALJ acknowledged the opinion of Dr. Gillogly that she should avoid any "repetitive" activity with either hand because of her carpal tunnel syndrome, the ALJ erred when he interpreted that restriction to mean that Plaintiff should avoid only "constant" use of her hands.

As set forth above in the FOF, the ALJ found that Plaintiff suffers from bilateral carpal tunnel syndrome and that the condition constitutes a significant impairment on her ability to work.  R. at 15.  He stated further as follows:

> The claimant has been treated by a hand surgeon, Scott D. Gillogly,
> M.D., who performed surgery at the Buckhead Surgery Center on her

right upper extremity due to carpal tunnel syndrome three times. [Dr. Gillogly is a board-certified orthopedic surgeon.] The last surgery to the right hand was in the beginning of April 2003, and unfortunately, the right hand did not improve much (Exhibit 10F). . . . Principally, she is still bothered by right hand/wrist/finger symptoms (she is right hand dominant). In any event, the claimant's bilateral hand impairment limits her ability to use her hands and she cannot use them constantly during the workday.

Notably, Dr. Gillogly did release the claimant to available "light sedentary work, avoiding any strenuous physical or repetitive activity with either hand" as stated in his January 29, 2004 report (Exhibit 9F, page 3). These limitations have been taken into account in arriving at the residual functional capacity set forth in finding #5 below.

R. at 15-16.

In determining the Plaintiff's residual functional capacity ("RFC"), the ALJ stated as follows in FOF 5: "As to manipulative limitations, she is unable to constantly use her right and left upper extremities because of her carpal tunnel syndrome." R. at 17. Plaintiff argues that the ALJ's use of "constantly" is not an accurate acknowledgment of Dr. Gillogly's opinion that she should avoid "any strenuous physical or repetitive activity with either hand" and thus, the ALJ failed to give the appropriate weight to Dr. Gillogly's opinion.

There is no dispute that Dr. Gillogly was Plaintiff's treating orthopedic surgeon. While the treating physician's testimony is to be given substantial or considerable

weight, the ALJ is not bound by the opinion of the treating physician.  20 C.F.R. § 404.1527(d).  The ALJ can reject a treating physician's report if it is not accompanied by objective medical evidence, is wholly conclusory,  lacks persuasive weight, or when the evidence supports a contrary conclusion.  Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Hudson v. Heckler, 755 F.2d 781, 784 (11th Cir. 1985); Bloodsworth v. Heckler, 703 F.2d 1233, 1240 (11th Cir. 1983).  If, however, the ALJ gives less weight to the opinion of a treating physician the reasons for doing so must be clearly articulated.  The failure to articulate those reasons is reversible error.  Lewis v. Callahan,  125 F.3d 1436, 1440 (11th Cir. 1997).

In the instant action, Plaintiff argues that the ALJ did not give the proper weight to Dr. Gillogly's opinion because the ALJ did not properly acknowledge that Plaintiff was precluded from "any strenuous physical or repetitive activity with either hand." Instead, the ALJ limited the RFC by finding only that Plaintiff "is unable to constantly use her right and left upper extremities because of her carpal tunnel syndrome."  R. at 17.  Plaintiff argues that "repetitive" does not mean the same thing as "constant," and thus, the ALJ improperly considered the Plaintiff to be able to perform jobs that included repetitive activity with her hands.

When questioning the Vocational Expert ("VE") during the hearing, the ALJ asked the VE to consider a hypothetical with a person with the Plaintiff's RFC as follows:

> Q.  The vocational profile is a younger individual with a GED education and the prior work that you just described.  First will be if the overall physical capacity was for a range of light work within a clean atmosphere and no constant use of the hands with the right hand being somewhat more affected than the left, would that – well, I guess the first question is could the cashier job be done?
>
> A.  With no constant use of both hands, no, Your Honor.
>
> Q.  No jobs at all?
>
> A.  No constant use of both hands.
>
> Q.  Well, I'm talking about just the limitation on constant use.  In other words, occasional and even frequent would be allowed.
>
> A.  Okay.  With that consideration the cashier II position would be a viable job for her.
>
> Q.  Okay.  I'm going to change it at this time.  The RC would be down to sedentary, once again with a clean atmosphere and the same limitation on the hands.  Once again, the limitation is to constant use.  And the question would be – obviously, all the prior work is out but would any jobs that exist in significant numbers be maintainable based on that?
>
> A.  Yes, Your Honor.  That would be an appointment clerk.  That would be a semi-skilled with sedentary.  The actual positions in the State of Georgia, 32,430, nationally, 1.3 million.
>
> Q.  Is that the only one?
>
> A.  No, Your Honor.  The other occupation would be charge account clerk.  That would be an unskilled job, sedentary.  The number of jobs in the state would be 2,000, nationally, 180,000.

Q.  And once again with the DOT description for these jobs is at all in variance with the hypothetical?

A.  No.  No, Your Honor.

R. at 437-48.

In sum, the VE at first testified that there were no jobs available under the hypothetical presented by the ALJ, if the hypothetical person with Plaintiff's background and RFC  was limited to a job that required "no constant use of the hands."  After the ALJ clarified that what he meant was that the person could do "occasional and even frequent" activity with their hands, however, the VE testified that the person could perform the jobs of appointment clerk and charge account clerk.[2] At no time did the ALJ include any limitation on "repetitive" activity with the hands in the hypotheticals he presented to the VE.  Because both of those jobs include the requirement of performing "frequent" activities such as lifting, pushing, and pulling, Plaintiff argues that substantial evidence does not support the ALJ's finding that Plaintiff could perform those jobs.

The Court agrees with Plaintiff that "repetitive" and "frequent" are not the same.  Dr. Gillogly opined in 2003 that the Plaintiff should avoid "any strenuous

---

[2] Under the agency's rulings, "frequent" activity means that the claimant could use her hands from one-third to two-thirds of the workday.  See SSR 83-14.

physical or repetitive activity with either hand."  In addition to Dr. Gillogly's opinion in 2003, Dr. Seiler also stated in 2004 that Plaintiff was unable to perform repetitive activity, "to include lift, push, pull."  R. at 260.  The ALJ acknowledged the opinion of Dr. Gillogly in his decision and stated that he had taken it into consideration when he found that the Plaintiff could perform jobs that required "frequent" use of her hands.  "Frequent" activity, however, is not the same as either "strenuous" or "repetitive" activities.  Frequent activity includes the use of the hands from one-third to two-thirds of each workday.  See SSR 83-14.  A restriction against "any repetitive activity," however, relates not to hours of use but to type of use, and two similar uses of the hand in a workday would seemingly be outside Plaintiff's capabilities as recited by her treating physician.  Because the ALJ did not consider a restriction on repetitive use in finding Plaintiff's RFC, his determination is not supported by substantial evidence.

Moreover, since the medical evidence is that Plaintiff could not work in a job requiring repetitive use of her hands, the ALJ should have asked the VE whether there were jobs in the economy for a person with Plaintiff's limitations, including a limitation of no strenuous or repetitive use of the hands.  Since he failed to do so, his hypothetical to the VE was not complete and the VE's opinion is insufficient to support a finding of no disability in this case.

B.    Headache Pain

Plaintiff next argues that the ALJ failed to evaluate properly Plaintiff's headache pain.  Plaintiff contends that the ALJ erred when he failed to accept her testimony as fully credible with respect to her allegations of headache pain and when he failed to acknowledge the medical evidence in the record supporting her testimony of headache pain.

The Eleventh Circuit "has established a three part 'pain standard' that applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms.  The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."  Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1993).  Social Security Ruling (SSR) 96-7p further states: "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."

SR 96-7p, 1996 WL 374186 (S.S.A.).[3]  The ALJ, however, is not required to cite particular regulations, cite specific cases, or use particular phrases or formulations in his opinion, so long as the Court is able to determine if the ALJ applied the statutory requirements and the Commissioner's regulations as applied by this Circuit.  Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).  The determination of whether a medical condition can reasonably be expected to give rise to the pain alleged is a question of fact subject to the substantial evidence standard of review.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  In addition, witness credibility is for the Commissioner to determine, not the courts.  Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir. 1991).

In the instant action, the ALJ discussed Plaintiff's allegations of headache pain as follows:

> As to a complaint of headaches, the claimant did complain of one episode of headache pain in September 2002 (Exhibit 6F).  She was given an injection of Demoral and Vistaril by T. Thompson, M.D., and it appears the headache resolved based on the lack of any follow-up.  the

---

[3]  Although Social Security Rulings issued by the Commissioner of Social Security to clarify implementing regulations and agency policies do not have the force of law, reviewing courts do and should give them some deference as the agency's interpretation of its own regulations, unless they are inconsistent with statutes or regulations.  Holohan v. Massanari, 246 F.3d 1199, 1201 n.1 (9th Cir. 2001); accord Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

claimant has also had a history of recurrent sinusitis and it was felt that her headaches may be sinus headaches (as opposed to migraines) (Exhibit 11F). It should be noted that the claimant testified that her herniated disc at C6 in the cervical spine causes headache pain. This is inconsistent with the medical literature. Specifically, a chart of the sensory dermatomes in The Merck Manual indicates a C6 involvement would impact the trapezius muscles down the shoulders (see The Merck Manual – 17th Edition, page 1348). It would not cause headache pain. In addition, the physical examinations of the claimant revealed the claimant was neurologically intact with no neurological deficits. . . .

She tended to exaggerate her complaints and minimize her capabilities, which undermined her credibility somewhat. For example, she complained of low back pain, but she takes no medicine for this. She testified to having headaches from the herniated disc at C6, but such a complaint is not attributable to nerve involvement at the level of C6.

R. at 16, 18.

Plaintiff argues that the ALJ's reference to The Merck Manual was improper because the ALJ was interpreting medical data that he was not qualified to do. According to Plaintiff, the ALJ was acting as both judge and physician. Plaintiff argues further that the medical literature includes many articles documenting headaches that are caused by problems with the cervical spine.

The Court agrees with Plaintiff that the ALJ improperly referred to The Merck Manual when evaluating the Plaintiff's complaints of headache pain and concluding that the Plaintiff's herniated disc could not cause headaches. Nevertheless, a review

17

of the record as a whole would support the ALJ's determination.  On the other hand, his reliance on his conclusion from a review of <u>The Merck Manual</u> that a herniated disc at C6 would not cause headache pain undercuts his conclusion that Plaintiff's credibility was affected because she attributed her headaches to her C6 herniated disc. Neither Plaintiff nor the ALJ were qualified to opine as to whether her C6 herniated disc caused her headaches.  Therefore, the ALJ's conclusion that she was less than credible because she may have been wrong as to the cause of her headaches undercuts his credibility determination.  On remand, the ALJ should reconsider the credibility of Plaintiff's complaints about headaches, without reference to her speculation as to the cause or his unqualified opinion that her speculation was wrong.

C.      Hearing Loss

Plaintiff next argues that the ALJ failed to evaluate properly Plaintiff's hearing loss.  The ALJ discussed evidence of the Plaintiff's hearing loss as follows:

> One of the claimant's doctors, John Burson, M.D., requested audiometric testing be performed, which was done on September 22, 2003 (Exhibit 2F, page 10).  A sensorineural loss was confirmed.  Her SRT (speech reception threshold) was 45 decibels in the left ear and closer to 60 decibels in the right ear (well above listing-level severity).  Her speech discrimination scores were nearly normal at 90% ADHD (right ear) and 100% AS (left ear).  However, the claimant was able to listen and respond to all questions at the hearing with no difficulty.  There was no problem with her ability to hear and to communicate.  Any hearing

18

impairment has no more than a minimal effect on her level of
functioning and would place no more than minimal limitation on the
claimant's ability to perform basic work activities.  It is considered not
severe.

R. at 17.

Plaintiff argues that the ALJ's reference to her ability to hear and communicate
was improper because it constituted "sit and squirm jurisprudence."  Sit and squirm
jurisprudence occurs when an ALJ, who is not a medical expert, subjectively
determines an index of traits he expects a claimant to demonstrate at the hearing and
denies the claim when the claimant falls short of the index.  Wilson v. Heckler, 734
F.2d 513, 517 (11th Cir. 1984); Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir.
1982).

The Court rejects the Plaintiff's argument that the ALJ failed to evaluate the
Plaintiff's hearing loss by improperly conducting "sit and squirm" jurisprudence.
Although the ALJ did refer to the Plaintiff's ability to hear and communicate as
demonstrated during the hearing, he also expressly referred to the results of the
audiometric testing performed on Plaintiff on September 22, 2003.  See R. at 139, 140.
As the ALJ noted, although a sensorineural loss was confirmed, the Plaintiff's speech
discrimination scores were nearly normal at 90% ADHD (right ear) and 100% AS (left

ear).  R. at 139.  The ALJ's reference to the Plaintiff's ability to hear and to communicate during the hearing was merely cumulative of the evidence of the audiometric testing.  Accordingly, the Court finds that substantial evidence supports the ALJ's decision that the Plaintiff's hearing loss was minimal and did not constitute a significant limitation on her ability to perform work-related activities.

D.    Spirometry Results

Plaintiff next argues that the ALJ failed to evaluate all of Plaintiff's spirometry results and failed to require additional testing or clarification.  Plaintiff contends that, as a result, the ALJ failed to develop the record properly regarding her pulmonary function and whether she met the severity requirements of the Listings.

In his decision, the ALJ discussed the Plaintiff's breathing impairments from emphysema and determined that her impairment was not sufficiently severe to meet or medically equal the requirements of Listing 3.02:

> The breathing impairment from emphysema does not satisfy the severity requirements of Listing 3.02 based on the available records. Additionally, the pulmonary function studies all appear to be pre-bronchodilation, which is not the criteria for measuring FEV-1 values under Listing 3.02.  The claimant's emphysema does not meet Listing 3.02A because it is not associated with FEV-1 values (post-bronchodilation values) equal to or less than the values specified in Table I for someone of the claimant's height.

R. at 17.

Plaintiff agrees that post-bronchodilation values are required to meet the severity requirements for Listing 3.02, but argues that the ALJ failed to consider her post-bronchodilation values in determining that Plaintiff did not meet the requirements for that Listing.  In order to meet the requirements of Listing 3.02 for chronic obstructive pulmonary disease, Plaintiff must demonstrate a post-bronchodilation FEV-1 value that is equal to or less than a value of 1.15.[4]  See 20 C.F.R., Subpart P, Appendix 1, 3.02A.  The SSA Regulations further state as follows:

> Spirometry should be repeated after administration of an aerosolized bronchodilator under supervision of the testing personnel if the pre-bronchodilator $FEV_1$ value is less than 70 percent of the predicted normal value. . . . If a bronchodilator is not administered, the reason should be clearly stated in the report.  Pulmonary function studies performed to assess airflow obstruction without testing after bronchodilators cannot be used to assess levels of impairment in the range that prevents any gainful work activity, unless the use of bronchodilators is contraindicated.  Post-bronchodilator testing should be performed 10 minutes after bronchodilator administration.

20 C.F.R., Subpart P, Appendix 1, 3.00E.

---

[4]  The FEV-1 levels that meet Listing 3.02 vary according to height, and the 1.15 threshold is for persons between 61 and 63 inches tall.  20 C.F.R., Subpart P, Appendix 1, 3.02A.  Plaintiff testified at the hearing that she is 5 feet, 1½ inches tall. R. at 422.

Plaintiff concedes that her spirometry results included post-bronchodilation testing in March 2002, October 2003, and March 2004, and that the results of those tests did not meet the requirements for Listing 3.02. See Pl. Br. at 22, R. at 183-89. Plaintiff argues, however, that the studies demonstrate that her post-bronchodilation FEV-1 values did not vary significantly from her pre-bronchodilation FEV-1 values, and further, that the post-bronchodilation FEV-1 values decreased over time: from 1.6 in March of 2002, to 1.41 in October of 2003 and 1.32 in March of 2004. See R. at 183, 184, 188. Furthermore, Plaintiff also underwent pulmonary function testing in November of 2005 by Dr. Francisco J. Negri and the spirometry results indicated that her pre-bronchodilation FEV-1 level was .83, which was less than 70 percent of the predicted value. R. at 313. Thus, Plaintiff argues, the ALJ should have acknowledged that her pulmonary functioning was deteriorating over time and her spirometry results from November of 2005 should have been deemed sufficient to meet the requirements of Listing 3.02. To the extent that the ALJ found that the results did not meet the requirements for Listing 3.02 because the FEV-1 value of .83 was from pre-bronchodilation testing rather than post-bronchodilation testing, because this test showed a FEV-1 level at less than 70 percent of the predicted value the ALJ should have ordered further pulmonary function testing to determine whether Plaintiff met the requirements for Listing 3.02.

The ALJ has a duty to consider all of the claimant's impairments, individually and in combination, and to develop the record regarding the effects of those impairments on a claimant's ability to work. An "ALJ has a basic obligation to develop a full and fair record. This obligation exists even if the claimant is represented by counsel." Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981); see also Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) ("It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.").

In the instant action, the ALJ reviewed the Plaintiff's pulmonary function studies and concluded that "the pulmonary function studies all appear to be pre-bronchodilation, which is not the criteria for measuring FEV-1 values under Listing 3.02." R. at 17. A review of the record, however, indicates that at least some of the Plaintiff's pulmonary function studies included post-bronchodilation FEV-1 values. See R. at 183, 184. Moreover, although Plaintiff concedes that her post-bronchodilation FEV-1 values were not less than 1.15, which is the level of severity required under Listing 3.02, the medical evidence reflects that her pre-bronchodilation FEV-1 value was tested at 0.83 in November of 2005 and there is no explanation in the report as to why there was no post-bronchodilation testing following this finding.

See R. at 313; 20 C.F.R., Subpart P, Appendix 1, 3.00E ("If a bronchodilator is not administered, the reason should be clearly stated in the report.").

In sum, the Court agrees with Plaintiff that the pulmonary function studies in the record might demonstrate that her chronic obstructive pulmonary disease was worsening and that her pulmonary function was deteriorating over time. Furthermore, the report from Dr. Negri in November of 2005 indicates that Plaintiff's pulmonary functioning may have reached the severity level required to meet Listing 3.02 at that time, but that the proper post-bronchodilation testing was not done to confirm whether Plaintiff actually met the Listing.

In light of the fact that this action is being remanded on other grounds, the Court urges the ALJ to develop the record fully regarding Plaintiff's pulmonary functions and whether she meets the requirements of Listing 3.02. If the ALJ determines that the reports do not contain enough information regarding Plaintiff's post-bronchodilation FEV-1 values, then further evaluation should be performed in order to determine the Plaintiff's functioning according to the SSA regulations.

E.    Appointment Clerk Job

Plaintiff's final argument is that the ALJ erred when he found that the Plaintiff could perform the job of appointment clerk because substantial evidence does not support that decision.  As discussed above, the VE testified at the hearing that, given the hypothetical presented by the ALJ, the Plaintiff would be able to perform the job of appointment clerk, which is a semi-skilled sedentary position.

> Q.  Okay.  I'm going to change it at this time.  The RC would be down to sedentary, once again with a clean atmosphere and the same limitation on the hands.  Once again, the limitation is to constant use.  And the question would be – obviously, all the prior work is out but would any jobs that exist in significant numbers be maintainable based on that?
>
> A.  Yes, Your Honor.  That would be an appointment clerk.  That would be a semi-skilled with sedentary.  The actual positions in the State of Georgia, 32,430, nationally, 1.3 million.
>
> Q.  Is that the only one?
>
> A.  No, Your Honor.  The other occupation would be charge account clerk.  That would be an unskilled job, sedentary.  The number of jobs in the state would be 2,000, nationally, 180,000.

R. at 438.

Plaintiff argues that the ALJ restricted the Plaintiff to only unskilled work, rather than semi-skilled, and thus, that substantial evidence does not support his decision that she could perform the semi-skilled job of appointment clerk.  The Court

notes, however, that the ALJ also found that she could perform the unskilled job of charge account clerk, and that there are 2,000 such jobs in the state and 180,000 nationally.  The Court finds, therefore, that even if substantial evidence does not support the ALJ's finding that the Plaintiff could perform the semi-skilled job of appointment clerk, he also found that Plaintiff could perform the job of account charge clerk and that such job exists in significant numbers in the national economy.  <u>See</u> <u>Allen v. Bowen</u>, 816 F.2d 600, 602 (11th Cir. 1987) (substantial evidence supported the ALJ's decision that the claimant could perform jobs that exist in significant numbers in the national economy when the record indicated the existence of 174 jobs locally and a "considerable number" of 80,000 jobs nationwide that the claimant could perform).

Because this case is being remanded on other grounds, however, the Court urges the ALJ to consider upon remand whether Plaintiff may perform semi-skilled rather than only unskilled work and to set forth his reasons in making such a finding in his decision.

## VI.   **CONCLUSION**

For the reasons stated above, the undersigned Magistrate Judge **ORDERS** that the decision of the Commissioner be **REVERSED** and **REMANDED** to the Commissioner for action consistent with this opinion.

**IT IS FURTHER ORDERED** that, in the event that past due benefits are awarded to the Plaintiff upon remand, Plaintiff shall have **thirty (30) days** after being served with notice of the determination of benefits to file an application for attorney's fees under 42 U.S.C. § 406(b).

IT IS SO ORDERED this 14th day of August, 2007.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE